COLLATERAL LENDERS COMMITTEE, James D. O'Donnell & Company, Inc., the Koenig Company, Patent and Boris, Group Associates, Inc., Metropolitan Associates, and Benjamin C. Cohen Special, Plaintiffs,

v.

The BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Defendant.

No. 68 Civ. 876.

United States District Court S. D. New York.

March 11, 1968.

Spear & Hill, New York City, for plaintiffs; Thomas W. Hill, Jr., Andrew Halperin, and Donald F. X. Finn, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., for Southern District of New York, for defendant; Laurence Vogel, Martin P. Solomon, Michael Hess, Asst. U. S. Attys., and Thomas J. O'Connell, Deputy General Counsel Federal Reserve Board, of counsel.

HERLANDS, District Judge.

The matters before the Court in this case affect immediately and importantly the national economy and the plaintiffs' business interests. The plaintiffs' expressed desire is to have any decision herein adverse to them reviewed as soon as practicable by the Court of Appeals.

This decision sets forth the findings of fact and conclusions of law which constitute the grounds of the Court's action, in accordance with Federal Rules of Civil Procedure, Rule 52(a).

Both sides have taken the position that they did not desire to call witnesses and that it is agreeable to them to have this Court decide the pending motion solely on the basis of the oral argument and the affidavits and briefs that have been submitted by counsel. (Stenographer's minutes of March 5, 1968, pages 3–10.)

The motion at bar brought on by order to show cause is for a preliminary injunction suspending and restraining the effectiveness, operation, enforcement, and execution of the regulation of the Board of Governors of the Federal Reserve System, dated February 8, 1968, known as Regulation G, 12 CFR, Part 207, 33 Federal Register 2691, pending the final hearing and determination of the action.

The order to show cause herein dated March 1, 1968 was signed by District Judge John M. Cannella and made returnable before this Court on March 5, 1968.

The parties appeared before Judge Cannella on March 1, 1968, 2:15 p. m., and he granted a temporary restraining order effective through March 5, 1968. The plaintiffs were required to, and did, post a $100,000 bond in connection with the granting of a temporary restraining order.

Upon the argument of the motion for a preliminary injunction on March 5th, 1968, before this Court, the Court did not renew or extend the temporary restraining order, which therefore expired on midnight, March 5, 1968. Upon application of plaintiffs the Court vacated the plaintiffs' bond.

The action, commenced by the filing of a complaint verified and filed on March 1, 1968, seeks a declaratory judgment that Regulation G is invalid and unconstitutional as to the plaintiffs, and seeks a permanent injunction enjoining the effective date of enforcement and execution of Regulation G as to plaintiffs. The complaint, being verified, was submitted in support of the preliminary injunction application.

The complaint brought on behalf of the plaintiffs who are engaged in the collateral lending business is directed against the defendant, The Board of Governors of the Federal Reserve System (hereinafter sometimes referred to as The Federal Reserve).

In substance, the complaint attacks Regulation G on various grounds that are spelled out at length in the complaint and also in the motion papers, the chief grounds being that the defendant improperly, invalidly, and unconstitutionally prescribed Regulation G; that the defendant in considering and promulgating Regulation G acted arbitrarily and in excess of its lawful powers and contrary to the requirements of the Administrative Procedure Act, 5 U.S.C.A. §§ 556, 557; that the plaintiffs, as a consequence of the promulgation and operation of Regulation G, will suffer immediate and irreparable loss and damage if Regulation G becomes effective on March 11, 1968, which is today. The complaint spells out, in numbered paragraphs such as paragraphs 21 to 26 thereof, various grounds for the invalidity and unconstitutionality of Regulation G. These grounds are mirrored and reflected in comparable language and form in the motion papers.

The defendant, by order to show cause dated March 4, 1968, moved to dismiss the complaint under Federal Rules of Civil Procedure, Rule 12(b) (6). However, by formal notice of withdrawal dated March 6, 1968, the defendant withdrew without prejudice its motion attacking the complaint. The Court permits the defendant to withdraw its motion attacking the complaint without prejudice to either party. This Court will not consider and adjudicate the issue raised by the withdrawn motion, though various aspects of the plaintiffs' claim must be considered as they are inextricably interwoven with the merits of the motion for a preliminary injunction.

On Sunday, March 10, 1968, yesterday, Circuit Judge Paul R. Hays heard plaintiffs' application for a temporary restraining order and plaintiffs' petition for a writ of mandamus directed to this Court. Judge Hays denied the application and the petition.

At the threshold of this decision and opinion the Court wishes to point out that the plaintiffs had ample time during the month of February, 1968, to bring on a motion for a preliminary injunction and to apply, if so advised, for a temporary restraining order, but failed to do so. Actually, the application for a temporary restraining order and the motion for a preliminary injunction were not made until March 1, 1968, and the moving affidavits in support of the motion for preliminary injunction appear to be sworn to on March 1, 1968.

The chronology, so far as it bears upon the plaintiffs' delay in seeking the drastic remedy of a preliminary injunction that would suspend the operation of a far-reaching regulation such as Regulation G, is as follows:

On February 1st, 1968, the Federal Reserve Board announced its adoption of Regulation G and issued to the press a statement in this regard. Simultaneously the Board transmitted for publication in the Federal Register a copy of the Regulation. This appeared in the Federal Register on February 8, 1968.

The record before this Court further reflects that the Board initiated, as of February 1, reproduction in printed form of the Regulation and transmitted to all Federal Reserve banks printer's copies of the same. On request of counsel for plaintiffs a full and complete copy of the press release and regulation was transmitted by mail to him on February 6, 1968.

The Court denies plaintiffs' motion for a preliminary injunction in all respects for the reasons now to be set forth.

As indicated already, on February 1, 1968, The Board of Governors of the Federal Reserve System adopted a number of changes to its proposed new and amended regulations to become affective today, March 11, 1968.

Stated in general terms, these changes broadened the coverage of, and tightened the regulations for, the use of credit in stock market transactions. In particular, as noted, plaintiffs challenge the validity of the new regulation, commonly referred to as Regulation G, which is entitled "Credit By Persons Other Than Banks, Brokers, Or Dealers For Purpose

of Purchasing Or Carrying Registered Equity Securities," 12 CFR, Part 207, 33 Federal Register 2691. This regulation extends to other lenders margin requirements which the Court finds and concludes are substantially the same as those long applicable to broker-dealers and banks on credit extended for the purpose of purchasing or carrying registered equity securities.

In view of the fact that time is of the essence so far as processing an appeal herein is concerned, the Court will forego an extensive excursion into the well-known legislative history of the statutory provisions that are of controlling importance in this case. However, in order to furnish necessary context and perspective even in skeleton form for the Court's decision, it may be pointed out, as is well known, that the Securities and Exchange Act of 1934 (sometimes hereinafter referred to as the 1934 Act) originated out of a sweeping and comprehensive investigation into stock market practices by the Senate Committee on Banking and Currency. The report of that committee, Senate Report No. 1455, 73rd Congress, Second Session (1934) delineated certain abuses in the securities market to which it attributed a considerable share of responsibility for the 1929 stock market crash.

Among the causes singled out by the investigators was the excessive use of credit in the stock market involving speculation upon thin margins which led to the sale of securities on a mass scale to meet margin calls upon any decline in the stock market.

The 1934 Act addressed itself, in part, to the control of credit in the securities markets, and by its provisions the 1934 Act, Sections 7 and 8, authorized the Federal Reserve Board to regulate the use of credit for the purchasing and carrying of securities, that is, to establish margin requirements.

The Federal Reserve Board was the preferred agency selected to exercise the power to set margin requirements because the Congress reasoned that the Board was the most experienced and best equipped credit agency of the government and had already been vested with cognate and related powers.

It will be recalled that, effective December 23, 1913, the Federal Reserve System had been established pursuant to the Federal Reserve Act, and that the principal purpose in establishing the Federal Reserve System was to foster a flow of credit and money that would facilitate orderly economic growth, a stable monetary system, and a long-run balance in international payments. The organization of the Federal Reserve System, including its Board of Governors, the 12 Federal Reserve Banks, the Federal Open Market Committee, numerous advisory bodies and similar consultative groups, is a matter of record and need not be detailed in this opinion.

The organizational setup of the Federal Reserve System and its operations over many years have demonstrated that the Federal Reserve Board helps to administer nationwide bank and credit policies; that there has been accomplished a systematic coordination in the administration of monetary policy including credit control; that there is a continuing communication between the Federal Reserve Board and the banking and business communities through the various techniques of the system, and in sum, the Federal Reserve Board, the defendant herein, possesses unique and outstanding expertise and corresponding responsibility in the fields that have been indicated. The expertise is the end-product of continuous study and contact on a daily basis with all of the manifold aspects of our securities and banking, monetary and financial systems and operations, public and private. The expertise represents the cumulative knowledge gained over many years and on many fronts. It is thus obvious why the Congress, in enacting the 1934 Act, placed with the Board of Governors, the defendant, the responsibility for effective control of the aggregate amount of credit resources which can be directed into the stock market, with particular regard to the po-

tentially destabilizing effect of such credit on the national economy.

The Senate Committee on Banking and Currency was concerned with the prevention of the undue diversion of the credit resources of the country into the stock market as was believed to have occurred in the period prior to the 1929 crash, and the Senate Committee was also concerned with deterring excessive speculation based upon too thin a margin. Senate Report No. 1455, supra, at 11; Remar v. Clayton SEC Corp., 81 F.Supp. 1014, 1017 (D.Mass.1949).

This profound concern of the progenitors of the 1934 Act is reflected in the provisions of the 1934 Act, 15 U.S. C.A. Section 78g(a), empowering the defendant to prescribe rules and regulations with respect to the amount of credit that may be initially extended and subsequently maintained on any security (other than an exempted security) registered on a national securities exchange for the purpose of preventing the excessive use of credit for the purchase or carrying of such securities.

Similarly, Section 7(b) of the 1934 Act, 15 U.S.C.A. Section 78g(b), allows the Board to prescribe margin rates lower than those set for it in Section 7(a) as it deems necessary or appropriate for the accommodation of commerce and industry, having due regard to the general credit situation of the country, and to prescribe margin rates higher than those fixed in Section 7(a) as it may deem necessary or appropriate to prevent the excessive use of credit to finance transactions in securities.

Section 7(c) of the 1934 Act, 15 U.S. C.A. Section 78g(c), makes it unlawful for members of the security exchanges and brokers and dealers who do business through the medium of such members (which means the great majority of broker-dealers in the country), to extend credit on registered securities (other than an exempted security) in contravention of the margin rules promulgated by the defendant pursuant to Section 7(a) and Section 7(b) of the Act, and to ex-

tend any credit at all on collateral other than registered securities or exempt securities or without collateral.

Section 7(d), 15 U.S.C.A. Section 78g (d), prohibits the extension of credit by any person in the ordinary course of that person's business for the purpose of purchasing or carrying a security registered on an exchange in contravention of such rules and regulations as the defendant shall prescribe to prevent the excessive use of credit for the purchasing or carrying of or trading in securities in circumvention of the other provisions of Section 7.

Section 7(d) further states that any rules or regulations (promulgated pursuant to the authority contained in Section 7(a) and Section 7(b)) may impose upon all loans made for the purpose of purchasing or carrying securities registered on national securities exchanges limitations similar to those imposed upon members, brokers or dealers by Section 7(c) and the rules and regulations thereunder.

Among the various arguments advanced by plaintiffs (see complaint, paragraph 21) is the contention that Regulation G is invalid for the reason that the term "excessive credit" as used in Section 7(d) is unconstitutionally vague.

It should be pointed out in connection with this claim as advanced by plaintiffs that the plaintiffs have adopted a somewhat erroneous approach in that plaintiffs assert (see complaint, paragraph 22) that the Board did not determine and find that plaintiffs caused excessive and undue speculation in the stock market. Actually, Section 7 does not require as a prerequisite to the issuance of a regulation any determination and finding regarding the cause of speculation.

Moreover, the section does not address itself to the existence of excessive credit use. Rather, subsections (a), (b) and (d) refer only to the Board's acting "for the purpose of *preventing* the excessive use of credit." (Emphasis added.) In other words, the statute clearly contem-

plates effecting regulatory action before and in anticipation of the fact rather than after the fact.

The critical question before us is whether for purposes of the Board's administrative activities the term "excessive use of credit" is a sufficiently clear, definite and meaningful term, as to constitute a reasonable standard in relation to which Regulation G can be promulgated.

■ The Court finds and concludes that the term "excessive use of credit" is such a reasonable standard.

■ The Court finds and concludes that the statute, and Regulation G issued pursuant thereto, insofar as it uses the term "excessive use of credit," is constitutional not only for purposes of administrative law but for purposes of the criminal law.

Although the Court does not have before it an indictment or any criminal proceeding which squarely poses the issue whether the expression "excessive use of credit" is unconstitutionally vague for purposes of charging a defendant with a crime, the Court agrees with plaintiffs that for purposes of this particular motion the Court has the power to issue an injunction to restrain the enforcement of an unconstitutional statute or regulation that would improperly impose criminal penalties or sanctions.

However, in this case, the Court finds and concludes that both as to administrative rules and regulations, as well as to criminal penalties, the term "excessive use of credit" is neither vague nor ambiguous according to constitutional criteria, and that the statute and Regulation G constitute an adequate predicate for administrative action as well as for criminal proceedings.

In United States v. McDermott, 131 F. 2d 313 (7th Cir. 1942), cert. denied, 318 U.S. 765, 63 S.Ct. 664, 87 L.Ed. 1137, rehearing denied 318 U.S. 801, 63 S.Ct. 827, 87 L.Ed. 1164 (1943), a criminal case where there had been a verdict of guilty, there was a square holding that Section 7 and Regulation T were valid. The is-

sue there raised was precisely the same issue raised herein, i. e., whether Section 7 was invalid because its provisions were so indefinite as to constitute an invalid delegation of legislative authority, and that Regulation T was invalid because of indefiniteness.

Without engaging in an extensive discussion of the rationale of *McDermott,* the Court regards it as authority for the proposition that the term "excessive use of credit" is sufficiently clear, definite, and meaningful as to constitute a proper basis and standard for administrative and prosecutive action.

Since *McDermott* involved a criminal prosecution it is a fortiori authority for the present case where the challenge is raised not in the context of an appeal from a criminal conviction following indictment and trial, but in a civil proceeding brought to test the issuance of Regulation G.

■ The Court finds and concludes that Section 7 reflects enactment of general provisions of law accompanied by a valid grant of power to the Board to act thereunder in order to fill out the details of the law. See e. g. Currin v. Wallace, 306 U.S. 1, 16–17, 59 S.Ct. 379, 83 L.Ed. 441 (1939).

In enacting Section 7, the Congress contemplated the possibility that under changing conditions credit might flow into the market from other sources. Plaintiffs assert that they are not to be included within the term "any person" contained in Section 7(d) of the Act and that the Board's Regulation G is therefore not valid and not lawfully applicable to them. In this Court's view the authority of the Board to regulate the plaintiffs pursuant to Regulation G is clear beyond reasonable doubt.

The word "person" is defined in Section 3 of the 1934 Act, 15 U.S.C.A. § 78c (9). There is no restrictive use of that word anywhere in the statute which would confine its application only to banks. The entire structure and phraseology of the statute indicate that the word "person" should be made applicable

to persons like the plaintiffs. Such is the legislative history and such is the internal logic of the phraseology of the statute.

■ The Court finds and concludes that the scope of Section 7(d) was not limited to banks but was made applicable to all persons other than those subject to regulation under Section 7(c).

The Board prior to October 20, 1967 promulgated two regulations under Section 78g. A regulation of the Board with respect to the extension of credit by broker-dealers is contained in Regulation T, 12 CFR, Part 220, 33 Federal Register 2695. This regulation promulgated pursuant to the authority contained in Section 7(c) of the 1934 Act was originally adopted by the Board on October 1, 1934.

The Board's second regulation is promulgated under Section 7(d) and is contained in Regulation U, 12 CFR, Part 221, 33 Federal Register 2702, as originally adopted, effective May 1, 1936. This regulation was made applicable to only one class of lenders covered by Section 7(d) of the 1934 Act, namely banks.

A third and new regulation promulgated under Section 7(d) is the subject of the present proceeding.

On October 20, 1967, the defendant announced, in a press release of general circulation, numerous proposed changes in existing regulations governing the use of credit in stock market transactions. Simultaneously, the defendant announced proposed new Regulation G that would extend to lenders other than brokers, dealers and banks margin requirements substantially the same as those applicable to brokers, dealers and banks on credit extended for the purpose of purchasing or carrying registered equity securities. The Board's proposals were published in the Federal Register on October 26, 1967.

This published notice provided a period ending November 20, 1967, within which the Board would receive and consider views and comments on the published proposals. Approximately 900 comments were received by the Board; about 100 of these comments expressed opposition to, or concern over, the subject of plaintiffs' present suit, namely, the proposal to regulate hitherto unregulated lenders.

The defendant had furnished the plaintiffs, between October 20, 1967, and February 1, 1968, with copies of 67 actual comments received by the defendant— that is 67 out of 900. This smaller number represented the comments that the defendant and its staff regarded as responsive to the request of plaintiffs' counsel.

Apparently a number of these comments were in the form of telegrams which did not express any reason for the opposition to the regulation, and probably there were duplicative comments, but, in any event, it appears from the affidavit of Thomas J. O'Connell, sworn to March 11, 1968, paragraph 7, that the defendant furnished plaintiffs with those comments that were regarded as responsive to the request of plaintiffs' counsel.

Prior to November 20, 1967, the defendant received numerous requests for extensions of time within which to submit comments, and eventually comments were received, including comments from one of the plaintiffs in this action, The Koenig Company. Mr. Ronald Koenig of The Koenig Company appeared before the Board's staff and was accompanied by legal counsel and by a professor of finance connected with New York University, all of whom made known their views to the defendant. Subsequent to December 8, 1967, the defendant received and considered further written comments on its proposal submitted on behalf of the plaintiff Collateral Lenders Committee.

Following analysis of voluminous comments and views submitted with respect to the Board's proposed changes in existing Regulations T and U, and with respect to its proposed new regulation G, the Board, on February 1, 1968, announced that it had adopted as of that date a number of changes in the existing and proposed regulations governing the use of credit in stock market transactions.

In addition, the Board's February 1, 1968 press release announced adoption of the proposed Regulation G in a form reflecting consideration of and action on comments received since October 20, 1967, the date of the Board's original announcement regarding the proposed new regulation. The general effective date of the amended Regulations T and U and of the newly promulgated Regulation G was announced to be March 11, 1968.

On February 7, 1968, the Board's amended and newly adopted regulations were accepted for filing at the office of the Federal Register. On February 8, 1968, the amended and newly promulgated regulations were published in the Federal Register. By letter dated February 6, 1968, the Assistant Secretary of the defendant, Robert P. Forrestal, forwarded to counsel for plaintiff Collateral Lenders Committee a copy of the Board's press release dated February 1, 1968, with attached texts of the Board's amended Regulations T and U and of the new Regulation G relating to securities credit extended by lenders other than brokers, dealers and banks.

The plaintiffs assert that they have been denied due process of law by the type of hearing conducted by the defendant. It is argued on behalf of plaintiffs that they were entitled to a full adjudicatory hearing with the right to present evidence and to examine and to cross-examine. The Court finds and concludes that this contention is without merit.

The Administrative Procedure Act, Title 5, U.S.C.A. Section 551 explicitly distinguishes between "rule making" and "adjudication". Subdivision (5) defines "rule making" as "agency process for formulating, amending, or repealing a rule", whereas subdivision (7) defines "adjudication" as "agency process for the formulation of an order". The term "rule" is explicitly defined in subdivision (4) while the term "order" is explicitly defined in subdivision (6).

It is clear that in the present case, both as a matter of form and as a matter of substance, Regulation G and the amendments to Regulations T and U represent the exercise of rule-making power as distinguished from adjudicatory power.

It may be noted that plaintiffs' attorney, upon the oral argument, admitted that Regulation G " * * * is not directed at us [plaintiffs] only. It is directed at a whole host of other lenders, including credit unions, pension funds, charitable foundations and the like". (Stenographer's minutes of March 5, 1968, page 15).

At the oral argument on March 5, 1968, plaintiffs cited and placed great stress upon two cases, United States v. Storer Broadcasting Company, 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956) and Federal Power Commission v. Texaco, 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964).

Counsel argued that these two cases supported the proposition that the plaintiffs herein were entitled to an adjudicatory hearing prior to the Board's promulgation of Regulation G.

A careful reading of both the Storer and Texaco cases, in the Court's judgment, sustains the defendant's rather than the plaintiffs' position, and in the light of the rationale of the Storer and Texaco cases it would seem clear that the defendant's action in promulgating Regulation G was not adjudication nor an order, but it was a rule and regulation promulgated in accordance with the procedure specified and required by the Administrative Procedure Act, Section 4, Title 5, U.S.C.A. Section 553.

There is much learning in the cases and in the commentaries as to the fundamental distinction between rule-making powers and adjudicatory or quasi-judicial powers and procedures. In view of the exigencies of the situation the Court will forego any extensive analysis of the numerous cases and other persuasive authorities which, in the Court's judgment, sustain the conclusion that in this case the defendant more than met the minimal requirements of the Administrative Procedure Act and bent backwards to comply

with the letter and spirit of the Administrative Procedure Act.

█ The Court therefore finds and concludes that, contrary to the plaintiffs' contention, there was no violation of the plaintiffs' procedural or substantive due process rights.

Every punctillio of procedure required by the Administrative Procedure Act was followed by the defendant.

█ The asserted fact that Regulation G represents a brand new rule in an area not heretofore regulated so far as the plaintiffs are concerned, and the fact that the promulgation and operation of Regulation G will have a substantial and material impact on the plaintiffs' business, do not convert the exercise of the defendant's rule-making power into a quasi-judicial act or process.

The defendant has been continuously aware of its responsibilities to regulate securities market credit by lenders other than banks and broker-dealers. The fact that Regulation G was promulgated on February 1, 1968, published February 8, 1968, and effective today, does not mean that in the years prior to these dates the Board was indifferent to, or ignorant of, or insensitive to, the problems in the collateral lenders' field. As a matter of fact, the seeming relative inaction of the defendant, vis-à-vis collateral lenders, was due to a considered judgment that under conditions then prevailing there was no need to cover the collateral lenders within such regulations as T and U, which were made applicable only to broker-dealers and banks. Illustratively, as pointed out in the Holland opposing affidavit, paragraphs 19, 20, 22, 23, 24, 25, 26, 27, 29, 30, 31, 32, 33, 34, and 35, the Board maintained an interest in the activities of collateral lenders.

On December 22, 1959, the defendant adopted Form FR728, which was required to be filed by each unregulated lender; approximately 200 lenders responded, about 65 of whom appeared to be collateral lenders, including certain of the plaintiffs in the present action. (See Oltman affidavit, paragraph 2.) However, it developed that the information provided through these filings and subsequent filings did not prove sufficiently valuable to the defendant to justify continuation of the reporting requirement, and on March 30, 1966, the Board withdrew Form FR728.

Information gained by the defendant through bank examination reports and other means of information indicated that the restrictive effect of the Board's action in requiring that bank loans to borrowers principally engaged in relending for stock market purposes comply with Regulation U (Section 221.3(q), effective June 15, 1959) had had some import. Interviews were conducted with unregulated lenders in connection with a 1963 SEC study of the securities markets (See H.R.Doc.No. 95, pt. 4, 88th Cong., 1st Sess. 25 (1963)), and it was suggested to the Board that such lenders had not found the provision a deterrent to their obtaining loans from banks. (See Holland opposing affidavit, paragraph 24.)

On August 8, 1963, the SEC submitted to Congress its special study, Chapter X which related to securities credit. This chapter was prepared with the assistance and cooperation of the staff of the defendant. Section 4 of Chapter X discussed the unregulated lenders. (See Holland opposing affidavit, paragraph 25.) This section was based, in part, on information obtained through interviews with approximately 58 collateral lenders doing a business similar to that of the plaintiffs in the present action.

The special study of the SEC alluded to the fact that the 58 unregulated lenders, for which some information was available, had loans outstanding at various times during 1961 in an aggregate amount of over $62,000,000, of which about $14,000,000 was estimated to be in clearances. The Board, with its awareness of the characteristics of unregulated loans, particularly their rapid turnover, 1 to 4 days on clearance loans, determined that the impact of credit extended by such lenders on the amount and quality of credit in the securities markets far

exceeded that which would be anticipated on the basis of the total amount of the outstanding loans. The SEC's special study also pointed to the potentially destabilizing effect on the market of loans by unregulated collateral lenders.

In addition, the SEC's special study found that users of unregulated credit tend to concentrate their dealings in relatively few stocks resulting in significant market impact even though the amount of unregulated credit extended might be modest in relation to total security credit, and the volume of dealings financed might be small in relation to aggregate market volume.

The special study recommended that the defendant should subject all persons who make loans to United States residents on the collateral of securities traded in the United States markets to the same requirements as are applicable to domestic bank loans collateralized with such securities; and that the defendant should act pursuant to the authority provided by Section 7 of the 1934 Act.

The defendant concurred in the foregoing recommendation. The defendant directed its staff to determine whether the existing provisions of Regulation U could be adapted and amplified to bring unregulated lenders within the coverage of that regulation.

The defendant's staff reported that it would be preferable to promulgate an entirely new regulation for this purpose. The defendant then instructed its staff to draft such a regulation.

Work on drafting the regulation, which was ultimately issued as Regulation G, the challenged regulation, began in the autumn of 1963. Complete staff drafts were prepared and considered by the defendant. On February 3, 1965, the defendant transmitted copies of the draft of the regulation to the presidents of the Reserve Banks, requesting comments and suggestions on the draft regulation and comments on the problem of unregulated lending in the securities market generally. Substantially similar letters were sent to the Securities and Exchange Commission.

Meanwhile, it had come to the defendant's attention that credit was flowing into the securities markets from unregulated sources other than collateral lenders such as plaintiffs. These other sources were credit unions, tax-exempt foundations, charitable trusts, and other similar enterprises.

The upshot of the defendant's studies was that a new regulation should be enacted covering lenders not already regulated.

The defendant has observed a reliable correlation between an increased volume of activity in the securities markets, accompanied by a marked use in overt customer credit activity, and a related rise in unregulated credit activity. The statistics are set forth in the opposing affidavit of Frederick Solomon, paragraph 8, sworn to March 5, 1968.

In addition, the Board observed advertisements in the press inviting the public to borrow on a highly-leveraged basis to purchase or carry registered securities. (See Holland opposing affidavit, paragraphs 36 and 37.)

Late in August, 1967, the defendants directed its staff to submit immediately appropriate documents and proposals in an intensified effort to close existing loopholes in margin regulation. The staff submitted such proposals to the Board, including a fresh draft of the regulation to cover the hitherto unregulated lenders. After intensive consideration by the defendant these proposals were released to the public on October 20, 1967, in the manner already described.

The Court finds and concludes on the basis of the entire record before it that the defendant had reasonable bases for the exercise of its judgment in promulgating Regulation G.

The Court finds and concludes on the basis of the entire record before it that there is no probability of success on the part of the plaintiffs upon a trial of the action-in-chief.

The Court finds and concludes within the rationale of cases exemplified by Air Line Pilots Association International et al. against Quesada, 276 F.2d 892 (2d Cir. 1960), that the Board had a clearly reasonable basis for the exercise of its judgment, and that the record before me, considered as a whole, contains substantial, persuasive and clear evidence establishing the reasonableness of defendant's conduct in promulgating the Regulation.

As already pointed out, so far as the margin requirements of Regulation G are concerned, substantially the same requirements are now imposed upon plaintiffs as are imposed on brokers, dealers, and banks. It is correct that in two respects the plaintiffs are not treated exactly the same as brokers, dealers and banks, though this difference in treatment is based upon a reasonable distinction and is not arbitrary or discriminatory. Flying Tiger Line Inc. v. Boyd, 244 F.Supp. 889 (D.D.C.1965). These two differences, stated summarily, are as follows:

One: Plaintiffs will be prohibited from making so-called purpose and non-purpose loans to the *same* borrower although banks may make such loans to the same borrower.

Two: Plaintiffs may not make loans to the same borrower on the basis of so-called mixed collateral whereas banks may do so. A mixed collateral loan is one involving a loan as to which collateral of both registered equity securities and of a non-stock nature is pledged. Included in the so-called non-stock collateral would be over-the-counter securities, that is, securities not carried on a securities exchange.

The difference in treatment accorded plaintiffs in the two respects mentioned stems from the defendant's reasonable judgment that the supervisory techniques and treatment that can be imposed and utilized with respect to banks makes application of the two above-noted prohibitions unnecessary with respect to banks and, from a supervisory point of view, unwarranted with respect to banks.

In this connection, it should be pointed out that with respect to the question of the purpose or non-purpose loans and plaintiffs' asserted inability to make the same, as expounded at the oral argument in this matter before the Court on March 5, counsel for the plaintiffs stated that the only type of loans plaintiffs made was on stock collateral. This would make such loans "purpose" loans. This raises a significant question as to the extent to which the non-purpose requirements of the Regulation affect plaintiffs in any way.

Regulation G has a February 1st date in one of its provisions. In order to avoid any confusion, should there be any further reference to that fact by counsel, the Court will point out that February 1st is the date when the Board of Governors adopted Regulation G. In announcing its adoption the Board stated that the effective date of the adopted Regulation would be today, March 11th 1968.

The Court finds and concludes that any delay in the effectuation of Regulation G and amended Regulations T and U would create confusion in the national security exchanges and would be immediately and irreparably injurious to the economy of the nation as a whole and to the investing public. This possibility of damage and danger must be offset against the possibility of injury and the nature of the injury that might be suffered by the plaintiffs. (See Abbott Laboratories v. Gardner, 387 U.S. 136, 156, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)).

Contrary to plaintiffs' contentions, the defendant does not concede that there would be irreparable injury to the plaintiffs' business or that the plaintiffs would be put out of business by operation of Regulation G. (See affidavit of Thomas J. O'Connell, sworn to March 11, 1968.)

The defendant does admit, and the Court recognizes, that there will be a *significant impact on the plaintiffs' business*; indeed, that is the purpose of the

regulation and it is undoubtedly true that compliance with Regulation G will require plaintiffs to readjust and reorganize their methods of doing business.

This Court has jurisdiction over this action.

The defendant was empowered by Congress to regulate loans made in the ordinary course of business by plaintiffs and others similarly situated.

■ The authority given by Congress to the Board of Governors in Sections 7 and 8 of the 1934 Act is valid and constitutional.

■ No adjudicatory type of hearing was required to enable the Board of Governors to effect valid promulgation of Regulation G.

The Board of Governors fully complied with the requirements of the Administrative Procedure Act in promulgating Regulation G.

The Court has already alluded to the fact that a careful analysis of all the affidavits as well as of the controlling provisions of law demonstrates that there is no reasonable probability of success of the plaintiffs' case on the merits.

Plaintiffs' constitutional rights have not, and will not be, violated by Regulation G or Regulations T and U as amended. The defendant is not threatening action under an unconstitutional law or unconstitutional regulation.

There is no substantial constitutional issue as to whether Section 7 of the Securities and Exchange Act of 1934 is an unlawful delegation of power to make law or whether it represents a lawful designation of authority in any other respect.

There is no substantial constitutional issue as to whether the Securities and Exchange Act of 1934 contains a sufficient statement of policy and purpose to give body and content to the term "excessive use of credit."

There is no substantial legal question as to whether the defendant's action, complained of by plaintiffs, was agency action by law committed to agency discretion within the meaning of Title 5, U.S. C.A., Section 701(a) (2) and whether procedural due process required the defendant to grant plaintiffs an adjudicatory-type hearing.

There is no substantial constitutional issue as to whether Section 7(d) of the Securities and Exchange Act of 1934, Title 15, U.S.C.A. Section 78g(d) sets forth a vague and illusory standard for determining whether any credit extended for the purpose of purchasing, carrying or trading in securities results in "excessive and undue speculation."

There is no substantial question as to whether the Board abused its discretion in promulgating Regulation G.

There is no substantial question as to whether the Board abused its discretion in promulgating Regulation G for the purpose (alleged by plaintiffs) of compelling plaintiffs to compete on even terms with other lenders, such as banks and brokers. The Board had no such purpose.

There is no substantial question as to whether Regulation G is proper against the allegation by plaintiffs that there are discriminatory disadvantages imposed upon lenders subject to Regulation G as opposed to brokers and banks subject respectively to Regulations T and U. Plaintiffs' allegation is unsubstantiated.

■ The defendant properly may prohibit private collateral lenders from making purpose or non-purpose loans to the same borrower.

■ Plaintiffs have failed to establish that the injunctive relief sought is necessary to prevent irreparable injury to them.

■ As already pointed out by the Court, plaintiffs will undoubtedly have to readjust and reorganize their methods of business in order to comply with Regulation G.

On the other hand, defendant has shown that the public will suffer irreparable and immediate damage should a preliminary injunction issue in favor of plaintiffs.

The Court denies in all respects plaintiffs' application for a preliminary injunction.

So ordered.