**William B. CALDWELL and Joan Caldwell**

v.

**GENESCO EMPLOYEES CREDIT ASSOCIATION.**

**No. 74–451–NA–CV.**

United States District Court,
M. D. Tennessee,
Nashville Division.

Jan. 27, 1975.

F. Dulin Kelly, Hendersonville, Tenn., for William B. Caldwell.

Douglas R. Berry, Nashville, Tenn., for Joan Caldwell.

Charles W. Bone, Gallatin, Tenn., for defendant.

## MEMORANDUM

MORTON, District Judge.

█ This is an action to declare void a loan and recover damages allegedly resulting from a violation of the margin requirements of Regulation G, 12 C.F.R. § 207.1, et seq., as promulgated by the Board of Governors of the Federal Reserve System pursuant to Section 7 of the Securities Exchange Act of 1934, 15 U.S.C. § 78g. A private right of action is implied under the Act for violation of margin requirements. Goldman v. Bank of the Commonwealth, 467 F.2d 439 (6th Cir. 1972). Jurisdiction is vested in this court under 15 U.S.C. § 78aa.

Plaintiffs, William B. and Joan Caldwell, are both citizens and residents of Tennessee. Defendant, Genesco Employees Credit Association (hereinafter G.E.C.A.), is a Tennessee corporation engaged in the loan and finance business and has its principal place of business in Nashville, Tennessee.

Plaintiffs' motion to enjoin a proceeding by G.E.C.A. in the Circuit Court of Sumner County, Tennessee, for enforcement of the promissory note was denied by order of this court on November 8, 1974. Thereafter, G.E.C.A. obtained a judgment in the State proceeding. The instant case was tried to the court on November 26, 1974. After considering the evidence, pleadings, stipulations and briefs submitted by counsel, the court now enters its findings of fact and conclusions of law.

Plaintiff William B. Caldwell was formerly employed by Genesco, Inc. and at divers times he elected to participate in the stock option plans available to employees of Genesco, Inc. At the time Mr. Caldwell terminated his employment with Genesco, Inc., he was obligated on 200 shares of Genesco stock for a total liability of $8,662.50. Mr. Caldwell elected to continue his participation in the stock purchase plan for a period of up to three years. According to the terms of this election, Mr. Caldwell's obligation would be reduced by dividends paid on the stock and at the end of the three year period he would either pay the outstanding balance or Genesco, Inc. would repurchase the stock at current price and apply the proceeds to the outstanding balance. If the proceeds from repurchase of the stock by Genesco, Inc. were insufficient to cover the outstanding debt, then Mr. Caldwell would remain liable for the deficiency.

In March, 1972, Mr. Caldwell's three year continuation period in the option plan ended; his outstanding obligation under the plan was $7,392.51. Mrs. Caldwell was then an employee of Genesco, Inc. and by reason of her employment was eligible to secure a loan from the G.E.C.A. In response to her husband's request, Mrs. Caldwell inquired into the feasibility of borrowing the outstanding balance of her husband's stock obligation from G.E.C.A. Mrs. Caldwell disclosed the purpose of the loan and received an application form that included the promissory note. Plaintiffs completed the required information items and returned the form to G.E.C.A. The application disclosed that the purpose of the loan was to "pay stock in full" and that 200 shares of Genesco stock in the name of "W. B. Caldwell" were to be collateral for the loan. The application form also contains the following notation added by an employee of G.E.C.A.: "M. Herlison to send Stock Cert to Credit Assoc," and the consumer credit disclosure statement accompanying the promissory note describes the collateral as "200 shares of Gen. stock." It is stipulated that G.E.C.A. intended that Mr. Caldwell's stock would be collateral for the loan.

From the depositions of G.E.C.A. employees, it appears that defendant frequently extended credit and relied on Genesco stock as collateral. The normal course of events would involve approval of the loan and the "stock department" of Genesco, Inc. would forward the ap-

propriate number of stock certificates to G.E.C.A. in those instances where the debtor had an interest in stock held by Genesco, Inc. pursuant to agreement, such as an employee stock option plan. G.E.C.A. would then retain the stock until the loan was repaid. However, in the instant case, Mr. Caldwell's stock certificates were inadvertently mailed to him after the loan proceeds were applied to his stock liability. It is stipulated that the stock certificates were mailed in an envelope from G.E.C.A. and the court concludes that G.E.C.A. mailed the stock to Mr. Caldwell. Defendant introduced no proof concerning the use of its office supplies and stationery by Genesco, Inc. and the court must therefore conclude that G.E.C.A. had possession of some or all of the certificates prior to the inadvertent delivery to Mr. Caldwell.

It is further stipulated that the loan to plaintiffs was in excess of the margin limits established under Regulation G if that regulation is applicable. G.E.C.A. contends that Regulation G is inapplicable and therefore no violation of the margin requirements resulted in this transaction. The registration provisions of Regulation G require, in pertinent part, that:

> Every person who, in the ordinary course of his businesss, . . . extends or arranges for the extension of a total of $50,000 or more or has outstanding at any time during the calendar quarter, a total of $100,000 or more, in credit, secured directly or indirectly, in whole or in part, by collateral that includes any margin securities . . . is subject to the registration requirements of this paragraph. . . . 12 C.F.R. § 207.-1(a).

The parties have stipulated that the G.E.C.A. extends or arranges for loans in excess of the minimum monetary limits established in 12 C.F.R. § 207.1(a). In briefs submitted on behalf of G.E.C.A. it is stated that defendant's loan volume for the year ending in March, 1972, was in excess of $11,000,000. Included within this total extension of credit were loans totaling over $200,0000 which were secured by "stock." Defendant's exhibit "D" is an information brochure distributed by G.E.C.A. which lists acceptable forms of loan collateral. Genesco Common Stock is the only type of margin security deemed acceptable in the brochure. The parties have stipulated that Genesco stock is a "margin security" as defined by 12 C.F.R. § 207.2(d). The court finds that defendant's credit activity therefore exceeded the minimum monetary limits of Regulation G for loans secured by "margin securities" as defined by 12 C.F.R. § 207.2(d).

The court concludes that G.E.C.A. is subject to the registration requirements of 12 C.F.R. § 207.1(a) on the basis of the aggregate loan volume secured by margin securities.

The applicability of margin requirements in purpose loans is provided by Regulation G as follows:

> Any person subject to the registration requirements of paragraph (a) [12 C.F.R. § 207.1(a), *supra*] of this section who, in the ordinary course of his business, extends or maintains or arranges for the extension or maintenance of any credit for the purpose of purchasing or carrying any margin security (hereinafter called "purpose credit"), if such credit is secured directly or indirectly in whole or in part, by collateral that includes any such security, is a "lender" subject to this part and shall not . . . extend or arrange for the extension of any purpose credit in an amount exceeding the maximum loan value of the collateral, as prescribed from time to time for margin securities. . . . 12 C.F.R. § 207.1(c).

In substance, this section provides that once a lender is required to register under paragraph (a), then the obligation of observing margin limits in any, and all, extensions of purpose credit is imposed under paragraph (c). However, defendant asserts that the instant loan was not made in the ordinary course of

business and that G.E.C.A. is not in the business of providing purpose credit.

The phrase "in the ordinary course of his business" is defined, for the purpose of Regulation G, as:

. . . occurring or reasonably expected to occur from time to time in the course of any activity of a person for profit or the management and preservation of property or in addition, in the case of a person other than an individual, carrying out or in furtherance of any business purpose. 12 C.F.R. § 207.2(b).

The court notes that the qualifying phrase, "in the ordinary course of his business," is employed in paragraphs (a) and (c) of § 207.1 and in light of the Board's definition of the phrase it is apparent that some degree of consistent construction is appropriate as one moves from paragraph (a) to paragraph (c).

■ In paragraph (a), the registration requirement is directed at those persons, other than banks, brokers and dealers, who provide credit in the ordinary course of business, even though not expressly in the business of providing credit. It is sufficiently clear that it is the aim of paragraph (a) to include a person whose business is the extension of credit. The history of Regulation G is reviewed in Collateral Lenders Committee v. Board of Governors etc., 281 F.Supp. 899 (S.D.N.Y. 1968), wherein it is noted that the Board sought to regulate a wide spectrum of previously unrestricted credit sources affecting the securities markets. These previously unregulated credit sources included "credit unions, tax-exempt foundations [and] charitable trusts" among other sources. 281 F.Supp. 899, 910. The "ordinary course" definition is broadly drafted in § 207.2(b) and therefore assures applicability of § 207.1 to credit sources such as charitable trusts which might otherwise be considered as extending credit other than in the ordinary course of their business and thereby avoid registration. In the case of a corporation in the business of providing credit, such as

G.E.C.A., which has from time to time extended credit secured by margin securities, the court finds the conclusion unavoidable that such loans are in the ordinary course of its business of providing credit. Thus, when the total credit extended and secured by margin securities reaches the monetary limits of § 207.1(a), the registration requirement then attaches. It is immaterial, under § 207.1(a), whether or not any portion of the credit secured by margin securities was for the purpose of "buying stock on margin" or, as properly defined by the Board, was "purpose credit."

■■ Margin limits are imposed under § 207.1(c) in the event of any extension of credit in the ordinary course of business when the loan is for "purpose credit." The ordinary course of business qualification in paragraph (c) relates to the nature of the lender's enterprise and the context giving rise to the transaction. It is not the debtor's intended application of the loan proceeds that determines whether the loan is in the lender's ordinary course of business. In the instant case, the loan was approved through defendant's normal procedures for considering credit applications, the loan was made in defendant's corporate name, the loan was made "for profit," and was an incident of defendant's express business purpose. The instant loan was one transaction among many extensions of credit made by defendant in furtherance of its business purpose, and the court is of the opinion that this loan was made in the ordinary course of G.E.C.A.'s business.

■■ It is not necessary for a lender to be in the express business of extending purpose credit before the provisions of Regulation G apply to his activities. If such were the case, then very few sources of credit would be subject to registration and Regulation G would have little effect in the way of correcting those practices which prompted the Board to further regulate the flow of securities credit. Suffice it to say that a loan extended by one expressly in the

business of lending money and made in that capacity is a transaction in the ordinary course of his business for the purpose of Regulation G.

G.E.C.A. also asserts that plaintiffs have no claim for the alleged violation of Regulation G. Defendant's argument is derived from the following circumstances: (1) the stock option was Mr. Caldwell's personal liability and he was ineligible to receive credit from the G.E.C.A., (2) the loan was made to Mrs. Caldwell and she signed the note as "maker" while Mr. Caldwell was merely a "co-maker," or accommodation party, and (3) the primary liability on the note was Mrs. Caldwell's and she had no interest in the stocks acquired by her husband. From these circumstances defendant claims there was no extension of "purpose credit" to Mrs. Caldwell within the meaning of Regulation G, and therefore no violation of § 207.1(c) occurred in the transaction.

Regulation G provides:

The "purpose" of a credit is determined by substance rather than form.

(1) Credit which is for the purpose, whether immediate, incidental, or ultimate, of purchasing or carrying a margin security is "purpose credit," despite any temporary application of funds otherwise. * * * 12 C.F.R. § 207.2(c)

Further, the Board has defined the term "customer" to include:

. . . any recipient of the credit to whom credit is extended directly or indirectly for the use of the customer, and also includes any person engaged in a joint venture . . . with the customer with respect to a purpose loan. 12 C.F.R. § 207.2(h).

■■ Defendant was fully informed and aware that the ultimate purpose and application of the credit in this case would be in satisfaction of Mr. Caldwell's stock option obligation. Such disposition of credit falls within the Board's definition of "purpose credit." The Board has relied on broad defini-

tions with the apparent intent of precluding avoidance of the margin requirements through sham or artificial devices. If the court were to accept defendant's contention, then the way would be open for avoidance of margin requirements through an entirely mechanical process consisting wholly of form and transparent distinctions. In light of the expansive definitions propounded by the Board, this court is unable to reach the conclusion suggested by defendant that a lender can: (1) extend credit to A, based in part on B's promise to secure the loan with margin securities; (2) with actual knowledge that the loan proceeds will be used to purchase the very stock B promises to use as security for the loan; and (3) then, avoid liability for violating the margin requirements by reliance on the form of the note. Approval of such a scheme would emasculate the regulation. The court therefore concludes that defendant's position is without merit. The loan was an extension of purpose credit, and plaintiffs are within the Board's definition of a "customer."

■ As previously stated, the court concludes that G.E.C.A. had possession of some or all of Mr. Caldwell's stock prior to the inadvertent delivery, and that G.E.C.A. would not have made the loan in question had it not intended to hold the securities as collateral. These considerations lead to the conclusion that the instant loan was "secured directly or indirectly in whole or in part" by margin securities. Thus, the further condition prescribed in § 207.1(c) that the extension of credit be secured by margin securities is satisfied.

The court notes that the definition of "indirectly secured" as used in Regulation G, § 207.2(i), essentially duplicates the definition under Regulation U, 12 C.F.R. § 221.3(c). In Cooper v. Union Bank, 354 F.Supp. 669 (C.D.Calif.1973), the meaning of the phrase "indirectly secured" under Regulation U was in issue and the court held that the lender must fulfill two conditions in order to

avoid a finding that purpose credit was indirectly secured by stock. The second of these conditions provides:

the loan must not contain any provisions which give or are intended to give the lending bank a priority or advantage over any other creditors in applying any stock owned by the customer to satisfy the borrower's obligation to the bank. 354 F.Supp. at 678.

At this point, the court notes that G.E.C.A. intended the stock to be collateral for the loan and it appears that the purpose of using the stock as collateral, together with G.E.C.A.'s possession, albeit short lived, of the stock, shows an intent on the part of G.E.C.A. to obtain a priority or advantage over other potential creditors.

The court in Freeman v. Marine Midland Bank—New York, 494 F.2d 1334 (2nd Cir. 1974), noted that Regulation U:

. . . does not require that a lender take any of the steps usually necessary to create a legally enforceable security interest. 494 F.2d at 1339.

 It is not necessary that a lender acquire a perfected security interest under the provisions of Article 9 of the Uniform Commercial Code before a loan is secured by margin securities within the meaning of the Board's regulations. A loan is "indirectly secured" if it appears that the lender relied on the stock as collateral. In the instant case, it appears that G.E.C.A. actually relied on the stock as collateral and would not have otherwise extended the sum of $7,392.61 based on plaintiffs' general financial condition.

In the pre-trial order submitted by the parties in this action, the following issue is proposed which relates to the question of remedies:

Whether the plaintiff['s], WILLIAM B. CALDWELL'S knowledge that the loan was illegal when actually made restricts his rights to recover this proceeding?

The background for this issue is amplified in defendant's brief which states:

The premise for this issue is the statement of plaintiff, WILLIAM B. CALDWELL, that he considered the transaction as "illegal" from the start. (Deposition of William B. Caldwell, page 48) . . . .

The court notes that Mr. Caldwell's deposition has not been introduced or otherwise submitted as evidence in this action. It does not appear that Mr. Caldwell possessed any particular legal expertise concerning the provisions of Regulation G, although he is an accountant. Further, it does not appear that Mr. Caldwell was privy to those facts which the court finds as compelling G.E.C.A. to register in accordance with § 207.1(a). Absent G.E.C.A.'s duty to register with the Board, the margin requirements of § 207.1(c) would not have applied to the loan, In the absence of some proof that Mr. Caldwell had knowledge of the factual circumstances that determine the applicability of Regulation G, the court is unable to conclude that Mr. Caldwell "knew" the loan was in violation of the margin requirements. Further, the court finds no evidence of fraudulent intent in the acquisition of this loan by plaintiffs.

 There was full disclosure of the purpose of the loan, and G.E.C.A. was in possession of those facts necessary for a determination of whether or not margin limits applied. The burden of observing the requirements of Regulation G must fall on the lender, as is the case under Regulations U and T for banks and brokers. Spoon v. Walston & Co., Inc., 478 F.2d 246 (6th Cir. 1973). The court concludes that plaintiffs were innocent parties according to the cases applying the remedy of rescission under 15 U.S.C. § 78cc, and therefore are entitled to have the promissory note declared void.

Plaintiffs also demand monetary damages, and the parties have stipulated as follows:

9. If the margin requirements of Regulation G apply to this action, the amount of the loan made by the G.E. C.A. to the plaintiffs exceeded the maximum loan value of the 200 shares of GENESCO, INC. stock.

\* \* \* \* \* \*

11. If the plaintiffs are entitled to damages in this cause, the maximum amount of such damages shall be $2,912.50.

Plaintiffs suggest that the court should follow Grove v. First National Bank of Herminie, 489 F.2d 512 (3rd Cir. 1973), wherein damages were allowed in a Regulation U violation for the decline in the value of stock from the time pledged to its value when the defendant bank sold the collateral. In commenting on this measure of damages the Third Circuit observed:

. . . The plaintiff's evidence contrasted the value of his securities *on the dates pledged to the Bank* with the *value on sell-out.* 489 F.2d at 515, footnote 6.

(emphasis in original).

In *Grove,* the bank had the right and exercised the right to sell the pledged securities. In the instant case, it is clear that G.E.C.A. lacked the power to sell Mr. Caldwell's stock following its misdelivery and also lacked any right to sell the stock before the plaintiffs defaulted on the note. Defendant's exhibit "A" indicates that the last payment on the note was made on March 30, 1973. Assuming that a "sell-out" would have been possible by G.E.C.A., it is possible that the sale would have been made as soon as the next payment or balance became due and was in default. If that were the case then the selling price would have been higher and any resulting deficiency would have been less. However, Mr. Caldwell held the stock and disposed of it at divers times in December of 1973, and subsequently, so that by the time of trial he had disposed of all the stock in question.

In reviewing the sell-out procedure and damage discussion in *Grove,* it is significant that the bank in that case received and retained the sale proceeds. Thus, while damages were allowed in that case based on the proposed formula, the bank retained those funds actually paid on the note and the funds generated by the sell-out. In the instant case, Mr. Caldwell decided to deal with the stock when he knew or should have known of G.E.C.A.'s reliance upon it as collateral. He decided when to sell and he received the proceeds of the sale or sales. This conduct falls outside the bounds of propriety and was wrongful. As a result of Mr. Caldwell's conduct, the G.E.C.A. has been denied those proceeds which would have been produced by a sell-out.

■ Mr. Caldwell testified in this cause, but he was unable to state what price was received in the sale of his stock. Not only was he unable to provide even an approximation of the selling price, but he was also unable to testify concerning the selling dates. This extraordinary inability to relate the essentials of the sale or sales appears to result from a purposeful avoidance of those simple inquiries which the ordinary person would pursue with some diligence. During his day in court, Mr. Caldwell displayed an avowed disinterest in the rudimentary facts relating to the disposition of the stock. Since the facts necessary for the proof of damages were peculiarly in the possession of plaintiffs and were not offered, the court concludes that plaintiffs have failed to prove their alleged damage by a preponderance of the evidence. Plaintiffs' retention of the undisclosed proceeds upon the sale of the stock and Mr. Caldwell's highly questionable conduct in dealing with the stock persuade the court that no money damages should be awarded in this case. Plaintiffs' demand for damages is therefore denied.

An appropriate order will be entered.