John R. FREEMAN, Appellant,

v.

MARINE MIDLAND BANK–NEW YORK, Appellee.

No. 228, Docket 73–1557.

United States Court of Appeals, Second Circuit.

Argued Nov. 26, 1973.

Decided March 25, 1974.

Jay J. Gurfein, P. C., New York City, for appellant.

Barrington D. Parker, Jr., New York City (Sullivan & Cromwell, New York City, on the brief, John W. Dickey, New York City, of counsel), for appellee.

Before MOORE, HAYS and TIMBERS, Circuit Judges.

HAYS, Circuit Judge:

In January, 1971, appellant John R. Freeman filed a complaint seeking a judgment declaring his various obligations to the Community Bank of Lynbrook, Long Island, void as extensions of credit in violation of Regulation U of the Board of Governors of the Federal Reserve System. He claimed that the bank lent him the full purchase price of stocks listed on national securities ex-

changes for the purpose of purchasing and carrying such stocks, and that his indebtedness was evidenced by "written negotiable instruments," in the hands of the bank or its assigns, the cancellation and return of which he prayed. He did not allege that the credit was secured, either directly or indirectly, by stocks.[1]

The Community Bank merged with the appellee Marine Midland Bank-New York on September 30, 1970. The successor bank denied having extended credit to Freeman, denied having advanced funds for the purpose of carrying or purchasing securities, and set up three "affirmative defenses": failure to state a claim upon which relief can be granted, lack of subject matter jurisdiction, and the plaintiff's unclean hands in procuring the funds. Alleging that Freeman and a faithless bank employee conspired to defraud the bank, it counterclaimed in fraud for $88,843.77.[2]

Subject matter jurisdiction was properly based on section 27 of the Securities Exchange Act of 1934. 15 U.S.C. § 78aa (1970).

Freeman resisted Marine Midland's motion under Rule 12(b)(6) with his own and his attorney's affidavits, which were answered by an affidavit of the bank's attorney.

The affidavits show an extended course of dealing between Freeman and the bank, a course characterized as an "illegal extension of credit" by Freeman, and characterized as a "check kiting scheme" by the bank. At various times, commencing in 1965, Community Bank paid directly to broker-dealers the full purchase price of stocks purchased for Freeman's account. When the securities were delivered to the bank, it in turn delivered them to Freeman (it is the latter delivery that the bank insists was fraudulently procured by Freeman).[3] In ex-

---

1. Freeman's complaint reads in pertinent part as follows:

"FOURTH: At various times in the past defendant extended credit to plaintiff.

"FIFTH: Defendant extended credit to plaintiff for the purpose of purchasing and carrying stocks registered and listed on national securities exchanges, and defendant knew that the loans were made to plaintiff for such purpose.

"SIXTH: Loans were made by defendant to plaintiff for the full purchase price of the stocks, in violation of Regulation "U" promulgated by the Board of Governors of the Federal Reserve System pursuant to the Securities and Exchange Act of 1934.

"SEVENTH: Plaintiff is presently indebted to defendant as a result of the aforementioned loans made for the purpose of purchasing and carrying stocks registered on national securities exchanges.

"EIGHTH: As evidence of plaintiff's indebtedness to defendant for the aforementioned loans, plaintiff issued to defendant written negotiable instruments.

"NINTH: Such written instruments are contracts made in violation of the Securities and Exchange Act of 1934 and of Regulation "U" of the Board of Governors of the Federal Reserve System promulgated thereunder.

"TENTH: Such contracts are void pursuant to Section 29(b) of the Securities

and Exchange Act of 1934, 15 U.S.C. 78cc(b).

"ELEVENTH: Upon information and belief, some of the written instruments issued by plaintiff may have been assigned to other party or parties.

"WHEREFORE, plaintiff demands judgment declaring void the debt owed to defendant as resulting from loans made in violation of the Statute and ordering defendant or defendant's assigns to surrender any written instruments evidencing such debt to this Court to be cancelled and for such other and further relief as this Court deems proper, together with the costs and disbursements of this action."

2. The counterclaim represents the uninsured portion of the bank's loss.

3. The Marine Midland side of the story is summarized in its affidavit supporting the motion to dismiss:

"(a) commencing in or about August, 1965, Freeman together with an officer of the Bank engaged in a scheme to defraud the Bank pursuant to which Freeman purchased securities from or through various securities brokerage concerns and ordered the securities delivered to the Bank for delivery against payment.

"(b) after securities were delivered to the Bank, plaintiff Freeman fraudulently procured the delivery of the securities to himself by delivering to his co-conspirator

change for the stock certificates, Freeman gave the bank his personal checks for the purchase price drawn on New York City banks. At first, sufficient funds were available to cover these checks, but as the course of dealing progressed, Freeman drew them against insufficient funds. In the case of such transactions, Freeman asked that the checks be held by Community Bank until funds were deposited in and collected by the drawee bank.

Freeman, in his affidavit, described his agreement with Community Bank as follows:

"The securities were delivered to me upon the express understanding that I would use them only to sell them promptly and deposit the proceeds in my New York bank to allow [the Community Bank] to present for payment the checks tendered to [the Community Bank] in exchange for the securities."

Early in 1968, the bank paid for shares of a speculative stock listed on the American Stock Exchange, and delivered them to Freeman against his post-dated checks for $365,943.77. Before Freeman could sell the stock and cover the overdrafts, the Securities and Exchange Commission stopped trading in the issue. The scheme collapsed on April 16, 1968, when Freeman informed the bank that he would not be able to make the checks good.

Marine Midland took the position in the district court that Freeman did not make out a claim because he did not allege that the credit was "secured" by a stock, as that term is used in Regulation U of the Board of Governors of the Federal Reserve System. 12 C.F.R. § 221.-1(a) (1973). Freeman offered to cure his pleading by amending it to state the conclusion of violations of sections 7(a) and (d) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78g(a) & (d) (1970), arguing that it is not necessary to allege a security arrangement to make out a violation of the Exchange Act. The district court granted the 12(b)(6) motion, dismissing the complaint with prejudice, and denied Freeman's motion for leave to amend. Freeman appeals from the dismissal of his complaint.

On the basis of the scant record before us, we reverse and remand. We agree with the district court's conclusion that a complaint based on the margin requirements must allege that the indebtedness is secured directly or indirectly by stock, but we find that the affidavits disclose a triable issue of fact as to whether the obligations in question were indirectly secured.[4]

within the Bank a check or checks drawn against insufficient funds in his personal checking account at another bank, which plaintiff and confederate knew did not contain sufficient funds.

"(c) upon information and belief plaintiff Freeman immediately thereafter would sell the securities which he had fraudulently obtained from the Bank and deposit the receipts in his personal checking account at the other bank in an attempt to cover the check or checks which he had previously delivered to his co-conspirator at the Bank.

"(d) As part of this fraudulent scheme Freeman's co-conspirator would hold such check or checks in his personal possession until informed by Freeman that the securities had been sold and sufficient funds had been deposited in plaintiff's personal checking account to cover the check which he had previously delivered to his co-conspirator at the Bank.

"(e) On or about April 16, 1968, the scheme collapsed when Freeman was unable to sell the securities which he had fraudulently obtained from the bank for an amount sufficient to cover the checks which he had previously delivered to his co-conspirator at the Bank."

4. All of the events giving rise to this action took place prior to the effective date of section 7(f) of the Securities Exchange Act of 1934, as amended by section 301 of the Bank Records and Foreign Transactions Act, Pub.L.No. 91–508, 84 Stat. 1114 (1970), and prior to the promulgation of Regulation X of the Board of Governors of the Federal Reserve System. 12 C.F.R. § 224 (1973). We therefore need not determine the effect of Regulation X, which makes the knowing borrower particeps criminis with the lender in a Regulation U violation, on our holding in Pearlstein v. Scudder & German, 429 F.2d 1136 (2d Cir. 1970), cert. denied, 401 U.S.

## I.

Freeman's first contention on this appeal is that the district court erred in holding that the complaint must allege that Freeman's loan from the bank was "secured" by a stock. His position, that he need only allege that credit was extended "for the purpose of purchasing or carrying a security," is based on the portion of section 7 which reads as follows:

"It shall be unlawful for any person . . . to extend or maintain credit . . . for the purpose of purchasing or carrying any security, in contravention of such rules and regulations as the Board of Governors of the Federal Reserve System shall prescribe . . . ." Securities Exchange Act of 1934 § 7(d), 18 U.S.C. § 78g(d) (1970).

Freeman's interpretation of the statute focuses on the language "for the purpose of purchasing or carrying any security," while it ignores the obviously limiting language "in contravention of such rules and regulations as the Board of Governors . . . shall prescribe." A loan does not offend against section 7(d) unless it violates the margin regulations promulgated under section 7 by the Federal Reserve Board.

To violate Regulation U, it is not sufficient that a bank extend "purpose" credit; it must also take stock as security for such credit. The regulation states that:

"no bank shall extend any credit *secured directly or indirectly* by any stock for the purpose of purchasing or carrying any margin stock in an amount exceeding the maximum loan value of the collateral. . . ." 12 C.F.R. § 221.1(a) (1973) (emphasis added).

To be subject to Regulation U, a loan must be for the purpose of purchasing or carrying securities, and it must be collateralized, either directly or indirectly, by stock. Solomon & Hart, Recent Developments in the Regulation of Securities Credit, 20 J. of Public L. 167, 174 (1971). The purpose requirement is statutory, deriving from section 7(d). The security requirement is from Regulation U, and embodies the Board's determination that banks should not be saddled with the burden of determining whether the purpose of each unsecured loan is to purchase or carry securities. Id. Were we to hold that Freeman's complaint is sufficient on its face, we would impose that burden on the Community Bank.

Freeman's complaint was defective in failing to allege that the obligation was directly or indirectly secured. Because the facts alleged were not sufficient to make out a violation of Regulation U, they do not make out a violation of section 7. Thus section 29, 15 U.S.C. § 78cc (1970), which voids contracts made in violation of the Exchange Act, does not avail Freeman. Because the proffered amendment to Freeman's pleadings did not contain sufficient additional facts to make out a violation of section 7, the district court acted within its discretion in refusing leave to amend the complaint to state the conclusion of a section 7 violation.

## II.

Despite the fact that Freeman's pleading was defective, the district court erred in dismissing the complaint. The Federal Rules of Civil Procedure provide that when matters outside the pleadings are considered on a Rule 12(b)(6) motion, the motion is to be treated as a motion for summary judgment under Rule 56, F.R.Civ.Proc. 12(b). 6 J. Moore, Federal Practice ¶ 56.02 [3] (1972); Pirone v. Flemming, 278 F.2d 508 (2d Cir. 1960), aff'g, 183 F.Supp. 739 (S.D.

1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971), the basis for this action. *Pearlstein* held that a borrower may maintain an action against a lender for margin violations despite the fact that he participated in the

margin violation. See R. Jennings & H. Marsh, Securities Regulation 1404 (3d ed. 1972); Note, Regulation X and Investor-Lender Margin Violation Disputes, 57 Minn. L.Rev. 208 (1972).

N.Y.1959). The plaintiff's affidavit opposing the bank's motion to dismiss should have been considered in testing the sufficiency of his pleadings, as well as in testing whether a triable issue of fact exists on the question of whether the arrangement with the bank was an indirectly secured loan.

■ The gist of Freeman's statement as to the nature of his deal with the bank is that he was to sell the securities turned over to him by Community Bank, using the proceeds to cover the overdrafts on his New York bank. The arrangement, if proved at trial, may come within the scope of the words "indirectly secured."

Regulation U defines "indirectly secured" as follows:

> "The term 'indirectly secured' includes any arrangement with the customer under which the customer's right or ability to sell, pledge, or otherwise dispose of stock owned by the customer is in any way restricted so long as the credit remains outstanding . . . ." 12 C.F.R. § 221.3(c) (1973).

The regulation does not require that a lender take any of the steps usually necessary to create a legally enforceable security interest. Rather it focuses on whether the arrangement impinges on the ability of the borrower to dispose of his securities. Regulation U is drafted in terms broad enough to combat any sharp practice developed by a lender to avoid the effect of the margin requirements and yet put himself in a better position than a general creditor. It is significant that Freeman's obligations to the bank were payable on demand, rather than at fixed maturities, and that the record does not disclose that the advances were supported by the type of current financial data usually required to justify the extension of personal credit. Both of these factors support an inference that the bank was primarily relying on the stock for repayment.[5]

One of the examples illustrating the meaning of "indirect security" in the Board of Governors interpretations accompanying Regulation U is similar to the arrangement disclosed by Freeman's affidavit:

> "A borrower may not deposit his stock with the bank, but agree not to pledge or encumber his assets elsewhere while the loan is outstanding.

> "Such an agreement may be difficult to police, yet it serves to some extent to protect the interest of the bank if only because the future credit standing and business reputation of the borrower will depend upon his keeping his word. If the assets covered by such an agreement include stock, then . . . the stock is 'indirect security' for the loan within the meaning of this part." 12 C.F.R. § 221.113(f)(2) (1973).

The central issues of fact in this case remain unresolved, but it appears that plaintiff states a claim for relief. The district court's decision granting the defendant's 12(b)(6) motion is reversed, and the cause is remanded for appropriate further proceedings.

---

5. The Board of Governors has taken the position that these two factors are significant in determining whether a stock is security: "some indication that the bank had not relied upon stock as collateral would seem to be afforded by such circumstances as the fact that (1) the bank had obtained a reasonably current financial statement of the borrower and this statement could reasonably support the loan, and (2) the loan was not payable on demand or because of fluctuations in market value of the stock, but instead was payable on one or more fixed maturities . . . ." 54 Fed.Res.Bul. 439, 440 (1968), *as quoted in* 5 L. Loss, Securities Regulation 3276 (1969).