John R. FREEMAN, Plaintiff,

v.

MARINE MIDLAND BANK and Aetna Casualty and Surety Company, Defendants.

No. 71 C 42.

United States District Court, E. D. New York.

March 24, 1981.

Jay J. Gurfein, P.C., New York City, for plaintiff.·

Richard E. Carlton, Robin A. Goldman, Anne G. Bookin, New York City, for defendant Marine Midland Bank.

Arthur N. Lambert, New York City, Carol A. Pisano, Brooklyn, N. Y., for defendant Aetna Casualty & Surety Co.

## DECISION AND ORDER

BRAMWELL, District Judge.

On January 7 and 8, 1981, this Court entertained the trial of "this seemingly endless litigation,"[1] in which the Court has been asked to assess the legal validity of seventeen checks delivered by the plaintiff, John R. Freeman, to an entity that subsequently merged with defendant Marine Midland Bank.[2] The plaintiff contends that these negotiable instruments should be declared void as extensions of credit in viola-

1. This case has had a checkered history. On January 28, 1973, then Judge Travia granted defendant Marine Midland Bank's motion to dismiss the plaintiff's complaint for failure to state a claim upon which relief could be granted. The Second Circuit, however, reversed this determination, remanding the action to this Court for a finding on the issue of whether Mr. Freeman's transactions with the defendant Bank were indirectly secured by stock. *Freeman v. Marine Midland Bank*, 494 F.2d 1334 (2d Cir. 1974).

In 1975, the Bank moved for summary judgment on various grounds. *See Freeman v. Marine Midland Bank*, 419 F.Supp. 440, 445 (E.D. N.Y.1976). In a July 30, 1976 Memorandum and Order, this Court denied the Bank's motion. The Court did, however, grant the Bank leave to renew its contention that the plaintiff's claim is barred by the doctrine of *res judicata* if it uncovered further evidence to that effect. The 1976 opinion also granted Mr. Freeman's cross motion to add defendant Aetna Casualty and Surety Company as a co-defendant. 419 F.Supp. at 454. On May 24, 1979, this Court denied yet another summary judgment motion interposed by the Bank. *Freeman v. Marine Midland Bank*, [1979] Fed.Sec.L.Rep. (CCH), ¶ 96, 902. In this motion, the Bank claimed, *inter alia*, that *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) and *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) had removed the legal predicate for the plaintiff's claim.

As 1979 drew to a close, the Bank spurred another flurry of motions by asserting that Aetna's presence in this action transformed the Bank into an unnecessary party. Aetna chimed in by renewing the Bank's prior summary judgment motion based on res judicata. On May 23, 1980, this Court denied both of these motions in an opinion rendered from the bench. When Aetna moved to certify for immediate appeal the questions raised by its motion, the Court denied the motion and ordered the parties to trial.

2. In the aggregate, these checks totalled $368,043.77. Finding of Fact 25 *infra*.

tion of Regulation U of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 221 et seq. (1980).[3] The defendants dispute this contention, arguing that the seventeen checks implicate neither the definition nor the purpose of Regulation U. In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, this Court will resolve this dispute through Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. The plaintiff, John R. Freeman, presently is an insurance agent (58).* He also has served as a principal of Allstate Factors, an outfit that purchased retail consumer credit obligations at discount (58–59).

2. During the 1960's, Mr. Freeman transacted business with the Community Bank of Lynbrook, New York (hereinafter referred to as "the Bank") (10).

3. Mr. Freeman had a $10,000 unsecured credit line with the Bank (100).

4. The Bank merged with defendant Marine Midland Bank on September 3, 1970 (8).

5. The Bank assigned any and all of its rights, claims and interests against Mr. Freeman to defendant Aetna Casualty and Surety Company on November 21, 1968 (Def. Ex. H, I).** [4]

6. In 1964, John Coughlin, an executive of the Bank (10),[5] introduced Mr. Freeman to Bruce Hervieux (10, 286, 336), the bank officer who handled Mr. Freeman's accounts at the Bank from 1964–1968 (261–62).

7. Mr. Hervieux had the authority to lend $5,000 on an unsecured basis and $10,000 on a secured basis (163, 262, 353; Def. Ex. J.).

8. As a result of his dislike for the length of the period encompassing the date that he paid a broker for stock that he purchased and the date that he actually received the stock (11, 81), Mr. Freeman involved Mr. Coughlin and then Mr. Hervieux in a procedure that he hoped would hasten his numerous security transactions (13, 314, 318).[6]

9. The procedure had the following elements:

i) Mr. Freeman would telephone a stock purchase order to a broker at a price acceptable to Mr. Freeman (12, 26);

ii) Mr. Freeman orally would instruct the broker to deliver the purchased stock to the Bank (12, 13, 27);

iii) Mr. Freeman would instruct the Bank to accept the stock (12, 27);

iv) after the purchasing broker received the stock, he would deliver it to Manufacturers Hanover Trust Company, his bank (29, 30);

v) Manufacturers Hanover Trust Company then would direct the Bank by way of collection letters to pay for the stock in return for delivery (30, 31);

vi) Mr. Hervieux would call Mr. Freeman to inform him that the stock had arrived at the Bank (31);

vii) after inspecting the stock at the Bank (14, 15), Mr. Freeman would tender his personal uncertified check to Mr. Hervieux in payment for the stock (14, 17, 21, 32, 286, 308);[7]

viii) Mr. Hervieux then would turn the stocks over to Mr. Freeman (34), and would put Mr. Freeman's check through for collection.

10. Between 1964 and January of 1968, the vast majority of the checks tendered to Mr.

**3.** The plaintiff has invoked 15 U.S.C. § 78aa (1976) to obtain this Court's jurisdiction over such a claim. See 15 U.S.C. § 78cc (1976).

* The numbers in parentheses denote reference to the transcript of the trial held in this matter.

** "Def. Ex." denotes reference to the exhibits introduced into evidence by the defendants at the trial of this case.

**4.** The Bank used this fact as the cornerstone of its 1979 motion to be freed from this litigation. That motion, however, was denied. See note 1 supra.

**5.** The plaintiff first met Mr. Coughlin in 1956 at the Springfield National Bank in Queens (8).

**6.** Three other banks with which Mr. Freeman did business refused to become involved in this procedure (19–21, 84, 88, 93).

**7.** Mr. Hervieux was under the assumption that it was proper to accept uncertified checks from Mr. Freeman (287).

Hervieux by Mr. Freeman pursuant to this procedure were backed by sufficient funds (15, 17, 335; *but see* 85, 107, 204); accordingly, the delivery against payment procedure did not pose a problem for that time period (304–05).

11. In early 1968, however, as Mr. Freeman's stock indebtedness began to exceed his working capital (209), he began to encounter difficulty in meeting the purchase price of the stock delivered to the Bank (17, 24, 124).

12. As a result, Mr. Freeman began to regularly accept securities from Mr. Hervieux in return for checks that Mr. Freeman *knew* were not backed by sufficient funds (33, 54, 85, 95, 107).[8]

13. Mr. Freeman asked Mr. Hervieux to hold these checks and the corresponding collection letters from Manufacturers Hanover Trust Company in his desk drawer until Mr. Freeman instructed him to release them (24, 209).[9]

14. On between thirty and fifty occasions (36, 108), Mr. Hervieux held checks tendered by Mr. Freeman in his drawer until directed to release them by Mr. Freeman (34, 108, 272).

15. Mr. Hervieux, however, did not know or suspect that the Freeman checks held in his drawer were drawn on insufficient funds (251, 252, 255, 256, 257, 263, 279, 281); in fact, acting out of trust for Mr. Freeman (281, 304),[10] Mr. Hervieux assumed that the checks were negotiable (303, 306, 317).

16. Mr. Freeman never told Mr. Hervieux that he did not have the funds to cover these checks (263, 270).

17. Neither Mr. Coughlin nor any other Community Bank executive was personally involved in the transactions between Mr. Hervieux and Mr. Freeman, or had knowledge of such transactions (242, 361).[11]

18. Mr. Hervieux did not transact business with any other customer in the manner that he transacted business with Mr. Freeman (273, 306, 307).[12]

19. It was Mr. Freeman's practice to employ the proceeds from the eventual sale of the stock delivered to him by Mr. Hervieux to cover the checks Mr. Hervieux held in his drawer (33, 34, 35, 37, 47, 228, 377).

20. This practice was *not* the product of an explicit agreement, arrangement or deal between Mr. Freeman and Mr. Hervieux, or any other Community Bank representative (233, 234, 254, 274, 292, 293, 294, 298, 300, 311, 312, 322, 371–73).[13]

21. Thus, notwithstanding this practice, (228, 233, 298, 371–73, 375, 377), Mr. Free-

---

**8.** Mr. Freeman was aware of the fact that it is a criminal offense to knowingly transfer checks drawn on insufficient funds when he so acted (93–95).

**9.** The date on the checks delivered by Mr. Freeman to Mr. Hervieux corresponded with the date of their delivery (115, 131). Thus, the Freeman checks do not satisfy the legal definition of a post-dated check. *In re Samuels' Will*, 15 App.Div.2d 618, 223 N.Y.S.2d 147 (3rd Dep't 1961). *See* Black's Law Dictionary, 5th Ed., p. 1050 (1979).

**10.** Mr. Hervieux believed in Mr. Freeman's financial viability (334, 336–38).

**11.** The plaintiff contends that the time gap between the date of Mr. Freeman's checks, the date of the Community Bank drafts corresponding to those checks, and the date of the appropriate Manufacturers Hanover Trust Company collection letters provides a sufficient basis upon which to charge the Bank officers with knowledge of the Hervieux-Freeman transactions (235–50). In this regard, the plaintiff deems it noteworthy that Community Bank executives signed the Bank drafts that responded to the collection letters. *See* Plaintiff's Exhibit 1. They did so, however, because Mr. Hervieux's check signing authority extended only to $20,000 (23). As this Court ruled at trial, it believes it improper to draw the inference sought by the plaintiff from these circumstances absent direct proof of knowledge by the Bank's officers of the transactions at issue (236, 237, 243, 244, 249, 250). The plaintiff submitted no such proof at trial.

**12.** It appears that Mr. Hervieux's course of conduct with Mr. Freeman was *ultra vires*. This is borne out by the fact that the Bank dismissed Mr. Hervieux in April of 1968 after learning of the Freeman "problem" (259).

**13.** When asked by the Court at trial if he ever made "an explicit agreement with the Community Bank that [he] would always use the proceeds from the sale of the stock that [he] purchased to cover the checks previously delivered to the bank," Mr. Freeman unequivocally re-

man could, in actuality, do "whatever he wanted" with the securities delivered to him by Mr. Hervieux in exchange for his uncertified checks drawn on insufficient funds (228; *see also* 275).

22. It became increasingly difficult for Mr. Freeman to pursue his practice of using the stock sale proceeds to cover the checks held by Mr. Hervieux when a substantial part of his stock holdings became unsaleable (207).

23. This state of affairs derived from the February 14, 1968 suspension of trading in Cameo Parkway Records stock by the Securities Exchange Commission (38, 214). Mr. Freeman had made substantial purchases of Cameo Parkway Records securities prior to the February 14, 1968 trading ban (38).[14]

24. As the suspension of trading in Cameo Parkway Records stock continued past its originally intended ten day span (217), the amounts of the checks Mr. Freeman left with Mr. Hervieux increased (*see* Def. Ex. B), as did Mr. Freeman's anxiety (36, 40).[15]

25. By April 15, 1968, Mr. Hervieux held in his desk drawer seventeen Freeman checks (Def. Ex. B–1—B–17) totalling $368,043.77 (41, 61; Def. Ex. B).[16]

26. All seventeen of these checks knowingly were drawn on insufficient funds (95, 122–40, 225, 226).

27. On or about April 16, 1968, Mr. Freeman informed Mr. Hervieux that the seventeen checks were drawn on insufficient funds, and that he lacked the capital to cover them (41, 143, 279, 280, 325).

28. A disturbed Mr. Hervieux then went to Mr. Coughlin with the Freeman "prob-

lem" (280, 327). Mr. Coughlin was visibly shaken upon hearing this news (327).

29. This was the first time that any Community Bank officer learned of the fact that Mr. Hervieux had been holding Mr. Freeman's checks (254, 282, 326, 327).[17]

30. On April 19, 1968, the Bank presented the seventeen checks to the Bank of New York (the drawee bank) for payment; only one of the checks was paid, leaving a total unpaid balance of $365,943.77 (120, 121, 122, 365).

31. The Bank then made payment in the amount of $368,043.77 for the securities (355).

32. On May 10, 1968, Mr. Freeman executed an assignment for the benefit of creditors (44, 45, Def. Ex. A, E.).

33. In a list of his personal assets dated May 10, 1968, Mr. Freeman did not categorize the seventeen transactions at issue in this action as "loans" or "extensions of credit;" he termed them "liabilities on account of purchases of stocks" (179; Def. Ex. D).

34. The Bank did not charge Mr. Freeman interest on any of the seventeen transactions at issue in this action (161).

35. A promissory note was not executed for any of Mr. Freeman's transactions with Mr. Hervieux, as required by Bank procedure for loans (26–33, 97–105).

## CONCLUSIONS OF LAW

Regulation U of the Board of Governors of the Federal Reserve System provides, in relevant part:

---

sponded in the affirmative (231). At his examination before trial, however, Mr. Freeman stated that he had *not* entered into a "bilateral agreement" with the Bank, but merely had made a "promise" as to how he would handle the securities delivered to him by Mr. Hervieux (233, 298, 371–73).

After Mr. Hervieux refuted the existence of such a "promise" on several occasions (254, 274, 292, 293, 294, 298, 300, 311, 312, 322), Mr. Freeman resumed the witness stand in an attempt to reconcile this "completely contradictory" testimony with his version of the facts (370–77). He did not succeed in this attempt. As this Court intimated at trial (250, 296, 371, 373, 376), it cannot accept as credible Mr. Free-

man's equivocal, evasive, and inconsistent testimony.

14. These purchases commenced in late January or early February of 1968 (210).

15. This is exemplified by Mr. Freeman's failure to sign two of the checks (158; Def. Ex. B–8, B–13).

16. The seventeen checks represented the largest number of checks held by Mr. Hervieux at one time (218).

17. *See* note 11 *supra*.

[N]o bank shall extend any credit secured directly or indirectly by any stock for the purpose of purchasing or carrying any margin stock in an amount exceeding the maximum loan value of the collateral...

12 C.F.R. § 221.1(a)(1) (1980). Thus, an assessment of the propriety of the plaintiff's claim in this action requires the Court to ascertain whether the Bank extended credit to Mr. Freeman, and whether such credit was secured directly or indirectly by stock.

### 1. Extension of Credit

An "extension of credit" or a "loan" implies an agreement pursuant to which one party transfers or delivers money or personal property to another in exchange for a promise to return such property; this promise to repay often is accompanied by compensation such as interest. *Kent v. Quicksilver Mining Co.,* 78 N.Y. 159 (1879). The plaintiff contends that the evidence produced at trial demonstrates the existence of such a course of conduct between himself and the Bank.

The record, however, belies this assertion in glaring terms. It indicates that no documents specifying the terms of the alleged extension of credit ever were prepared for the seventeen transactions at issue as required by Community Bank procedure (F. 35).*** It points out that neither Mr. Hervieux, who believed that Mr. Freeman's checks were drawn on sufficient funds (F. 15, 16), nor any other Community Bank official or executive considered Mr. Hervieux's transactions with respect to the seventeen checks to be an extension of credit to Mr. Freeman (F. 17, 28, 29).[18] It also illustrates that the Bank did not charge Mr. Freeman interest on the seventeen transactions (F. 34), and that the $368,043.77 amount of the transactions vastly exceeded Mr. Hervieux's $10,000 maximum lending authority (F. 7) as well as Mr. Freeman's $10,000 unsecured credit line (F. 3). In fact, the record reflects that even Mr. Freeman did not list the seventeen transactions as "loans" in his schedule of assets (F. 33).

The interplay of these facts has convinced this Court that Mr. Freeman's unusual bank dealings *(see* F. 18) do not constitute an extension of credit. Indeed, it is this Court's belief that such dealings can best be described as "check-kiting," or the deliberate practice of drawing checks against deposits which have not yet cleared through the collection process. *Marine Midland Bank v. John E. Russo Produce Co., Inc.,* 50 N.Y.2d 31, 38, 405 N.E.2d 205, 208, 427 N.Y.S.2d 961, 964 (1980). Since "check-kiting" is a "form of fraud and misrepresentation," *United States v. Payne,* 602 F.2d 1215, 1218 (5th Cir. 1979), *cert. denied* 445 U.S. 903, 100 S.Ct. 1079, 63 L.Ed.2d 319 (1980), courts have refused to characterize the funds obtained from such a practice as the product of an extension of credit. *Liberty National Bank & Trust Co. v. Travelers Indemnity Co.,* 58 Misc.2d 443, 295 N.Y. S.2d 983 (Sup.Ct. Erie Cty. 1968); *United States v. Payne,* 602 F.2d at 1218; *National Bank of Com. in New Orleans v. Fidelity & Casualty Co.,* 312 F.Supp. 71 (E.D.La.1970). This Court considers this rationale as yet another factor that militates in favor of the conclusion that the Bank did not extend credit to Mr. Freeman on the seventeen transactions at issue.

### 2. Securing the Transactions

Regulation U states that:

The term "indirectly secured" includes any arrangement with the customer under which the customer's right or ability to sell, pledge, or otherwise dispose of stock owned by the customer is in any way restricted so long as the credit remains outstanding, or under which the exercise of such right, whether by written agreement or otherwise, is or may be cause of acceleration of the maturity of the credit: Provided, that the foregoing shall not apply (1) if such restriction arises solely by virtue of an arrangement with the customer which pertains gener-

---

*** "F" denotes reference to this Court's Findings of Fact.

18. *Id.*

ally to the customer's assets unless a substantial part of such assets consists of stock, or (2) if the bank in good faith has not relied upon such stock as collateral in the extension or maintenance of the particular credit.

12 C.F.R. § 221.3(c) (1980). In its 1974 opinion in this matter, the Second Circuit observed that the issue of whether or not a particular situation falls within this definition presents a question of fact. *Freeman v. Marine Midland Bank*, 494 F.2d 1334, 1339 (2d Cir. 1974). *See generally* Climan, *Civil Liability Under the Credit Regulation Provisions of the Securities Exchange Act of 1934*, 68 Cor.L.Rev. 206 (1977).

In this case, the evidence elicited at trial leads this Court to resolve this factual question in the defendants' favor. This conclusion is mandated by the absence of a binding agreement, arrangement or deal between Mr. Freeman and the Bank to "support [the] inference that the bank was primarily relying on the stock for repayment." *Freeman v. Marine Midland Bank*, 494 F.2d at 1339; (F. 20, 21). Absent such mutuality of purpose, this Court cannot conclude that Mr. Freeman's "right or ability to sell, pledge or otherwise dispose" of the stock delivered to him by Mr. Hervieux was "in any way restricted." *See* F. 21.

Nor can this Court conclude on the basis of the record that the purpose underlying Regulation U would be furthered by voiding the seventeen checks at issue. In its 1974 opinion, the Second Circuit recognized that

> Regulation U is drafted in terms broad enough to combat any sharp practice *developed by a lender* to avoid the effect of the margin requirements and yet put himself in a better position than a general creditor.

494 F.2d at 1339 (emphasis added). In the instant case, the practice sought to be condemned was not "developed by [the Bank]." (F. 17, 20, 21, 27, 28, 29). It derived solely from the interaction of *Mr. Freeman's* knowing transfer of checks drawn on insufficient funds to Mr. Hervieux (F. 12, 26, 27), *Mr. Freeman's* request that Mr. Hervieux hold these checks in his drawer until told to release them (F. 13, 14, 25), and *Mr. Freeman's* practice of employing the proceeds from the anticipated sale of the stock delivered to him by Mr. Hervieux to cover the checks (F. 19, 22). Under these circumstances, this Court deems it improper and inequitable to accede to the plaintiff's request to implement Regulation U so as to void the seventeen checks at issue in this litigation.[19]

Accordingly, it is hereby

ORDERED that the plaintiff's request for a judgment declaring null and void the seventeen checks that are the subject of this litigation is DENIED; and it is further

ORDERED that judgment be entered forthwith in favor of defendant Marine Midland Bank and defendant Aetna Casualty and Surety Co., and it is further

ORDERED that judgment be entered forthwith on defendant Aetna Casualty and Surety Company's counterclaim for $260,-405.59.

---

**19.** Since this Court is of the opinion that the Community Bank did not violate Regulation U, it need not consider the issue of whether the plaintiff had a full and fair opportunity to litigate his Regulation U claim in the assignment proceedings. For a complete discussion of this issue, *see* 419 F.Supp. at 446 49.